UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

ARMADILLO DISTRIBUTION
ENTERPRISES, INC.,

                                     /

Case No.: 8:26-bk-04925-CPM

Chapter 11

ARMADILLO DISTRIBUTION
ENTERPRISES, INC., and
CONCORDIA INVESTMENT
PARTNERS, LLC,

      Plaintiffs,

v.

EVAN RUBINSON, and
ROSS SACCO,

      Defendants.

                                     /

Adv. No.: _____

## ADVERSARY COMPLAINT

Armadillo Distribution Enterprises, Inc., a Florida corporation, and Concordia Investment Partners, LLC, a Florida limited liability company (collectively, the "Plaintiffs"), debtors in bankruptcy cases pending before this Court,[1] sue Defendants Evan Rubinson and Ross Sacco, and allege:

## Parties, Jurisdiction, and Venue

1.     Plaintiff Armadillo Distribution Enterprises, Inc. ("Armadillo") is a Florida corporation with its principal place of business in Tampa, Florida.

---

[1] A motion requesting joint administration of the Concordia case with the Armadillo case is being filed contemporaneously with this action.

2.     Plaintiff Concordia Investment Partners, LLC ("Concordia") is a Florida limited liability company with its principal place of business in Tampa, Florida.

3.     Defendant Evan Rubinson ("Evan") is an individual residing in Hillsborough County, Florida.

4.     Defendant Ross Sacco ("Sacco") is an individual who, upon information and belief, may either reside in Hillsborough County, Florida or Marion County, Florida.

5.     This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1334(b). This is a core matter under 28 U.S.C. § 157(b)(2)(A) and (O). Plaintiffs consent to the entry of final orders and judgments by the bankruptcy court.

6.     Venue is proper under 28 U.S.C. § 1409(a).

## Factual Background

### A.  The Ownership and Management of the Plaintiffs.

7.     Elliott P. Rubinson ("Elliott") was a successful business entrepreneur in the music industry.

8.     Elliott passed away on February 6, 2017.

9.     Armadillo and Concordia are among the companies that Elliott founded and successfully operated. Armadillo manufactures and distributes musical instruments, and Concordia owns and maintains the intellectual property rights relating to Armadillo's brands.

10.     Pamela Keris-Rubinson ("Pam") is Elliott's widow.

11.     Evan is the only child of Pam and Elliott.

12.     Armadillo is 100% held by Pam as trustee of the Pamela A. Rubinson Marital Trust.

13.     Concordia is 50% held by Pam as trustee of the Pamela A. Rubinson Marital Trust; and 25% by Pam as trustee of the Pamela Anne Keris-Rubinson Living Trust.

14.     In or about January 2017, in furtherance of Elliott's wishes, Pam appointed Evan as a director, President, and CEO of Armadillo.

15.     In or about April 2019, Pam and Evan were appointed managers of Concordia.

16.     In June 2022, Pam, as trustee, terminated Evan from his positions at both Armadillo and Concordia as alleged in more detail below. Upon Evan's termination, Pam became Chief Executive Officer (CEO) of both Armadillo and Concordia, and she currently serves in that capacity for both companies.

17.     Sacco served as Armadillo's Chief Financial Officer (CFO) from approximately June 2000 until his termination in July 2022, alleged in more detail below.

**B.  The Relationship between Plaintiffs and Valley National Bank.**

18.     At all material times, Armadillo had a banking relationship with Valley National Bank ("Valley"), which included a lending relationship and deposit accounts.

19.     In or about 2011, Armadillo entered a loan agreement in the principal amount of $7,500,000 with the predecessor to Valley, to provide working capital.

20.     In or about June 2020, Valley and Armadillo modified and restructured the loan to a revolving line of credit with a maximum principal amount of $4,500,000.

21.     Armadillo as Borrower executed and delivered a Promissory Note to Valley (the "Note"), which Concordia executed as Guarantor.

22.     The Note purports to be secured by substantially all of Armadillo's assets as well as Concordia's intellectual property.

23.     The Note and related loan documents required Armadillo to provide Valley with periodic financial reports demonstrating Armadillo's compliance with debt covenants under the Note and loan documents.

**C.  Evan's Gross Mismanagement and Breaches of Fiduciary Duty.**

24.     When Elliott operated Armadillo, Armadillo enjoyed historically high annual revenues. During Evan's tenure as President and CEO starting in 2017, Armadillo's financial performance steadily declined.

25.     Before Evan took over, in 2011 through 2015, Armadillo's annual sales ranged between $20.5 million to $24 million; after Evan took over, in 2017 through 2021, Armadillo reported annual sales ranging between $16.3 million to $18 million.

26.     During Evan's tenure, Evan and Sacco grossly mismanaged Armadillo and "looted" the company by engaging in corporate waste and dissipation of corporate assets for their own personal benefit, including taking exorbitant pay, misappropriating funds from the company's bank account, taking reimbursements for expenses having nothing to do with Armadillo's business, and misdirecting to Evan payments that the company was entitled to receive. More specific examples are alleged below.

27.     Evan caused Armadillo to write 22 separate checks totaling $279,023.39, from the Armadillo account at Valley to Evan, which Evan took for his personal benefit. Armadillo booked these checks as "repay shareholder loan" but Evan was never a shareholder of Armadillo, and he never made any loans to Armadillo. Evan simply took the money. Sacco, Armadillo's CFO, aided and abetted Evan's theft by instructing Armadillo staff to make the payments to Evan and book them as "shareholder loan" repayments.

28.     Evan and Sacco fraudulently reported fake sales, accounts receivable, income information, and inventory information on Armadillo financial statements provided to Valley in connection with Armadillo's financial reporting obligations, as alleged in more detail below. To make matters worse, Evan and Sacco then improperly issued exorbitant bonuses to themselves

based upon that fraudulent reporting, effectively causing Armadillo to improperly incur unnecessary debt to fund exorbitant and unearned bonus payments. From 2018 through 2020, Sacco received more than $266,000 in payments tied to inflated performance numbers.

29.     By June 2022, Evan and Sacco had almost fully drawn upon the Valley line of credit, which funds were used in part to fund the improper payments to Evan and Sacco, and there were no funds available to provide Armadillo with the working capital needs that the loan was supposed to fund. Both Armadillo, as borrower, and Concordia, as guarantor, are now burdened with this unnecessary debt, as well as the costly, distracting, and damaging litigation with Valley, described below, that directly resulted from Evan's misconduct.

30.     Evan caused Armadillo to spend exorbitant sums of money to fund litigation while failing to appropriately select affordable counsel to charge a reasonable rate commensurate with the potential litigation risks and benefits.

31.     On at least three separate occasions, Evan caused the proceeds of litigation settlements stemming from claims that had been prosecuted and negotiated on behalf of Armadillo or Concordia to be misdirected to Evan's personal bank account.

32.     Evan and Sacco failed to pay critical vendors, manufacturers, and suppliers, damaging Armadillo's reputation and causing vendors to refuse to manufacture instruments for Armadillo without a fifty percent up front deposit (which Armadillo was not in a financial position to pay due to Evan's mismanagement).

33.     Evan received purported reimbursements for expenses that were not for services or products utilized for Armadillo's business.

34.     Evan and Sacco provided incorrect financial information to Armadillo's tax accountants, leading to the filing of improper tax returns, exposing Armadillo to corresponding

risk and costs. This included falsely designating income to Pam personally rather than the Trust, and this caused direct damage to Pam and the Trust, among other damage that they suffered as a result of Evan and Sacco's misconduct.[2]

35.     Evan misappropriated valuable guitars from Armadillo's guitar collection and continues to wrongfully possess them.

**D.  The Concealment of Evan's Misconduct, Aided and Abetted by Valley.**

36.     Evan and Sacco hid their misconduct and Armadillo's declining financial condition from Pam, other Armadillo officers, and from Valley by fraudulently manipulating the financial reporting, keeping a separate set of false books, and cutting off or severely limiting Pam's and other officers' access to Armadillo's financial and operational information. This continued at all material times until it was alleviated by Evan's termination in June 2022 and Sacco's termination in July 2022.

37.     For example, in late 2021 and early 2022, Armadillo's then-Executive Vice President of Global Sales, Patrick Schuleit, requested Sacco provide him with an accounts receivable aging report so that Schuleit could focus on collecting outstanding receivables to help address Armadillo's increasingly desperate cash position. Sacco responded in an email dated December 1, 2021, that supposedly "for confidential reasons, we [Sacco and Ross] cannot give you the full AR aging." Schuleit complained (accurately) in response that he had "not had any visibility [into amounts that needed to be collected] and feel with cash flow needs – this is a very active part of that equation."

---

[2] Pam individually and as Trustee has brought claims against Evan and Sacco in the action styled *Evan Rubinson v. Pamela A. Keris*, Thirteenth Judicial Circuit Court in and for Hillsborough County, Florida, Case No. 2022-CA-006635-L, before Circuit Judge Farfante.

38.     Upon being shut out by Evan, Pam—as the sole shareholder of Armadillo, and the signer of the Valley line of credit and related mortgage to Armadillo's affiliate that owned the property where Armadillo operated (discussed below)—repeatedly requested that Valley provide Pam with financial information and visibility regarding Armadillo.

39.     Vally informed Pam that Evan had instructed Valley not to provide Pam with access to Armadillo's banking records or information. Valley inexplicably and unjustifiably complied with that instruction and steadfastly refused to provide any access or information about Armadillo to Pam despite Pam's status, known to Valley, as Armadillo's vice president and sole shareholder (Valley even had copies of the Trust agreements confirming Pam's status as sole Trustee and shareholder).

40.     On or about June 10, 2022, Pam, as Trustee, fired Evan as Armadillo's president and CEO, and assumed operational control of Armadillo.

41.     Evan also was terminated from his management position at Concordia.

42.     Pam initially kept Sacco on as CFO of Armadillo, as she did not know of his role in Evan's misconduct. On July 5, 2022, unbeknownst to Pam, Sacco sent an email to an Armadillo employee asking her to review $2,371,000 in accounts receivable for a particular set of customers listed on Armadillo's financial statements and confirm which of the listed accounts were fake "noise" and which were real. The response to Sacco indicated that only $450,000 of the accounts receivable identified were real and collectible.

43.     After gaining control over Armadillo, Pam engaged forensic accountants who undertook an investigation into Evan's management of the company, which revealed for the very first time the extent of the malfeasance by not only Evan but also by Sacco. For example, Sacco admitted in a series of emails with the forensic professionals in early July 2022 that the basic

information—like, "how do you know what a customer actually owes you?"——was not "readily available" and was essentially lost in the shuffle of fabricated book entries.

44.     Pam terminated Sacco on or about July 19, 2022.

45.     After Sacco was terminated and no longer stood in the way of a fulsome forensic investigation, Pam and Schuleit (who was appointed President of Armadillo after Evan's termination with Pam continuing to serve as CEO), with the help of the forensic accountants, determined that only approximately $2.3 million of the approximately $12 million in accounts receivable on Armadillo's books was "real" and potentially collectible.

46.     As part of the scheme to falsify Armadillo's sales reports, Evan and Sacco created fake "phantom" sales. This scheme was revealed by a forensic analysis of Armadillo's financial reporting, which reflects that from 2016 to 2021, Armadillo's accounts receivable increased from approximately $5.3 million to over $12.3 million, yet Armadillo's net sales were flat in the same period, indicating that sales were inflated.

47.     Evan and Sacco's fraudulent misconduct is corroborated by internal emails that were revealed after Sacco was terminated. On December 14, 2018, and again on April 29, 2019, Sacco sent Evan an email regarding Armadillo's 2019 sales goal, in which they discuss the need for "fake orders" to be "backed out" of the 2018 numbers to enable them to identify the "actual organic sales" for forecasting purposes.

48.     Evan and Sacco also fraudulently manipulated Armadillo's accounts receivable. For example, on December 15, 2020, Sacco sent an email (which was discovered during the investigation, after Sacco was terminated) to two Armadillo employees directing them to move accounts listed as 60 to 90 days past due to 0 to 30 days past due in Armadillo's bookkeeping software "to get the bad accounts to look a little better." Sacco added: "don't do anything too

drastic, <u>or the bank might notice</u>," and he further instructed them not to move exact dollar amounts from one column to another, "or it will be a <u>red flag</u>." (emphasis added).

49. At all times from at least January 2017 through and until Sacco's removal in July 2022 or Evan's removal in June 2022 at the absolute earliest, Armadillo was controlled by parties acting contrary to Armadillo's interests, namely, Evan and Sacco, who engaged in misappropriation and other misconduct that was concealed and hidden not only from Valley, but also from Pam and the other officers of Armadillo until after Evan and Sacco's termination. Indeed, as alleged below, Valley has filed an action against Evan relating to the Evan's misconduct in which Valley alleges that Evan "prepared and maintained shadow financial records, which were separate from Armadillo's official financial records, to hide Armadillo's true financial condition from Valley <u>and other interested parties</u>," namely, Pam.

50. In or around December 2022, after Pam confronted Valley and demanded damages based on Valley's improper conduct in freezing her out of access to Armadillo's bank accounts and financial information as alleged above, Valley retaliated by, among other things, manufacturing loan defaults against Armadillo and Concordia.

51. More specifically, Valley commenced an action against Armadillo to accelerate and enforce the Note and foreclose Valley's alleged security interests styled *Valley National Bank v. Armadillo Distribution Enterprises, Inc., et al.*, pending in the Thirteenth Judicial Circuit Court in and for Hillsborough County, Florida, Case No. 2022-CA-010510-G, before Circuit Judge Nash (the "Valley Action").

52. In its complaint in the Valley Action, Valley falsely alleged that Armadillo's affiliate, EPR Investments, L.C. ("EPR"), had defaulted by failing to make a mortgage payment with respect to the property where Armadillo operates (owned by EPR); Valley then falsely alleged

9

a cross-default by Armadillo stemming from the false default by EPR. To be clear, neither EPR nor Armadillo had defaulted on their respective obligations to Valley when the Valley Action was commenced. Instead, Valley ignored funds that had been placed in the EPR account from which the loan payments were swept monthly in the ordinary course of the parties' lending relationship and manufactured the default.

53. Valley recently filed its Fifth Amended Complaint in the Valley Action, which continues to falsely allege defaults by Armadillo, and alleges claims against Evan for fraud, fraudulent misrepresentation, and negligent misrepresentation based on his fraudulent reporting and other misconduct alleged above.

54. Armadillo and Concordia have brought counterclaims against Valley in the Valley Action for aiding and abetting Evan's breaches of fiduciary duty, among other claims.

55. Whatever the outcome of the Valley Action, Armadillo and Concordia both have suffered significant harm in connection with the Valley Action in the form of attorney's fees, costs, damage to reputation, and otherwise; all of which flowed naturally and foreseeably from Evan and Sacco's misconduct alleged herein.

56. The delayed discovery doctrine, the continuing violations doctrine, and equitable tolling, among other doctrines, apply to all causes of action asserted herein

57. All conditions precedent to bringing this action have occurred, have been performed, or have been waived.

## COUNT I
## BREACH OF FIDUCIARY DUTY
## BY ARMADILLO AGAINST EVAN

58. Armadillo incorporates paragraphs 1 through 57 as if fully restated herein.

59. This is an action for breach of fiduciary duty against Evan.

10

60.     As an officer and director of Armadillo, Evan owed fiduciary duties of care, loyalty, and good faith.

61.     The duty of care required Evan to use that amount of care which an ordinarily careful and prudent individual would use in similar circumstances and to consider all material information reasonably available in making business decisions.

62.     The duty of care is breached by gross negligence, meaning the officer or director failed to inform themselves fully and in a deliberate manner before making a corporate decision. In other words, gross negligence occurs, and the duty of care is breached, when an officer or director makes a recklessly decision.

63.     Evan breached the duty of care by engaging in acts or omissions on behalf of Armadillo that: (i) were ill-advised, uninformed, and failed to consider material information; (ii) constituted a failure to act under circumstances in which due attention would have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; and (iv) resulted in corporate strategies that reflected an indifference to the potential risk of harm to the companies, such that reasonable business persons would have carefully considered the obvious negative consequences.

64.     The duty of loyalty and good faith required Evan to put Armadillo's interests above his own interests. In addition, the duty of loyalty and good faith is breached when an officer, director, or manager abdicates their duties to the company by either a) failing to act in the face of a known duty to act, or b) demonstrating a conscious disregard for their duties. In other words, the duty of loyalty and good faith is breached when the defendant approaches the operations of a company with indifference.

65.     Additionally, Evan's fiduciary duty required him to make objective decisions based on the merits of a situation, rather than on outside influences or for personal gain. This means his

decision making was required to be free from conflicts of interest, allowing him to act solely in the best interest of the company.

66. Evan breached the duty of loyalty by acting with a purpose other than advancing the best interests of Armadillo, and by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities. Evan was required to use his utmost ability to control and manage Armadillo in the company's best interests, as opposed to his own personal interests.

67. Evan breached the duty of loyalty by displaying a lack of diligence that was more culpable than inattention or failure to be informed of all material facts.

68. Evan, because of his own acts as well as his position of control and authority, directly and indirectly sanctioned, or failed to object to the improper, grossly negligent, and disloyal acts described herein.

69. But for Evan's grossly negligent, intentional, and fraudulent conduct, the harm suffered by Armadillo described herein would not have occurred.

70. Evan's breaches of fiduciary duty adversely impacted and conferred no benefit on Armadillo. As a direct and proximate result of such breaches, the company suffered significant losses and incurred substantial debts that they would not have otherwise incurred, all in amounts to be determined at trial.

71. Additionally, Evan aided and abetted Sacco's breaches of fiduciary duties to Armadillo, and in so doing Evan breached his own fiduciary duties to Armadillo, making Evan jointly and severally liable to Armadillo for any harm caused.

**WHEREFORE**, Armadillo demands the entry of judgment against Evan for compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount

to be proven at trial, pre-judgment interest, post-judgment interest, costs, and such other relief as the Court deems just.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**BY CONCORDIA AGAINST EVAN**

72.     Concordia incorporates paragraphs 1 through 57 as if fully restated herein.

73.     This is an action for breach of fiduciary duty against Evan.

74.     As an officer and director of Concordia, Evan owed fiduciary duties of care, loyalty, and good faith.

75.     The duty of care required Evan to use that amount of care which an ordinarily careful and prudent individual would use in similar circumstances and to consider all material information reasonably available in making business decisions.

76.     The duty of care is breached by gross negligence, meaning the officer or director failed to inform themselves fully and in a deliberate manner before making a corporate decision. In other words, gross negligence occurs, and the duty of care is breached, when an officer or director makes a reckless decision.

77.     Evan breached the duty of care by engaging in acts or omissions on behalf of Concordia that: (i) were ill-advised, uninformed, and failed to consider material information; (ii) constituted a failure to act under circumstances in which due attention would have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; and (iv) resulted in corporate strategies that reflected an indifference to the potential risk of harm to the companies, such that reasonable business persons would have carefully considered the obvious negative consequences.

78.     The duty of loyalty and good faith required Evan to put Concordia's interests above his own interests. In addition, the duty of loyalty and good faith is breached when an officer,

13

director, or manager abdicates their duties to the company by either a) failing to act in the face of a known duty to act, or b) demonstrating a conscious disregard for their duties. In other words, the duty of loyalty and good faith is breached when the defendant approaches the operations of a company with indifference.

79.     Additionally, Evan's fiduciary duty required him to make objective decisions based on the merits of a situation, rather than on outside influences or for personal gain. This means his decision making was required to be free from conflicts of interest, allowing him to act solely in the best interest of the company.

80.     Evan breached the duty of loyalty by acting with a purpose other than advancing the best interests of Concordia, and by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities. Evan was required to use his utmost ability to control and manage Concordia in the company's best interests, as opposed to his own personal interests.

81.     Evan breached the duty of loyalty by displaying a lack of diligence that was more culpable than inattention or failure to be informed of all material facts.

82.     Evan, because of his own acts as well as his position of control and authority, directly and indirectly sanctioned, or failed to object to the improper, grossly negligent, and disloyal acts described herein.

83.     But for Evan's grossly negligent, intentional, and fraudulent conduct, the harm suffered by Concordia described herein would not have occurred.

84.     Evan's breaches of fiduciary duty adversely impacted and conferred no benefit on Concordia. As a direct and proximate result of such breaches, the company suffered significant

losses and incurred substantial debts that they would not have otherwise incurred, all in amounts to be determined at trial.

**WHEREFORE**, Concordia demands the entry of judgment against Evan for compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial, pre-judgment interest, post-judgment interest, costs, and such other relief as the Court deems just.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## BY ARMADILLO AGAINST SACCO

85. Armadillo incorporates paragraphs 1 through 57 as if fully restated herein.

86. This is an action for breach of fiduciary duty against Sacco.

87. As an officer of Armadillo, Sacco owed fiduciary duties of care, loyalty, and good faith.

88. The duty of care required Sacco to use that amount of care which an ordinarily careful and prudent individual would use in similar circumstances and to consider all material information reasonably available in making business decisions.

89. The duty of care is breached by gross negligence, meaning the officer or director failed to inform themselves fully and in a deliberate manner before making a corporate decision. In other words, gross negligence occurs, and the duty of care is breached, when an officer or director makes a recklessly uninformed decision.

90. Sacco breached the duty of care by engaging in acts or omissions on behalf of Armadillo that: (i) were ill-advised, uninformed, and failed to consider material information; (ii) constituted a failure to act under circumstances in which due attention would have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; and (iv) resulted in corporate

15

strategies that reflected an indifference to the potential risk of harm to the companies, such that reasonable business persons would have carefully considered the obvious negative consequences.

91.     The duty of loyalty and good faith required Sacco to put Armadillo's interests above his own interests. In addition, the duty of loyalty and good faith is breached when an officer, director, or manager abdicates their duties to the company by either a) failing to act in the face of a known duty to act, or b) demonstrating a conscious disregard for their duties. In other words, the duty of loyalty and good faith is breached when the defendant approaches the operations of a company with indifference.

92.     Additionally, Sacco's fiduciary duty required him to make objective decisions based on the merits of a situation, rather than on outside influences or for personal gain. This means his decision making was required to be free from conflicts of interest and free from influence by interested parties, allowing him to act solely in the best interest of the companies.

93.     Sacco breached the duty of loyalty by acting with a purpose other than advancing the best interests of Armadillo, and by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities. Sacco was required to use his utmost ability to control and manage Armadillo in the respective best interests of those companies, as opposed to his own personal interests.

94.     Sacco breached the duty of loyalty by displaying a lack of diligence that was more culpable than inattention or failure to be informed of all material facts.

95.     Sacco, because of his own acts as well as his position of control and authority, directly and indirectly sanctioned, or failed to object to the improper, grossly negligent, and disloyal acts described herein.

16

96. But for Sacco's grossly negligent, intentional, and fraudulent conduct, the harm suffered by Armadillo described herein would not have occurred.

97. Sacco's breaches of fiduciary duty adversely impacted and conferred no benefit to Armadillo. As a direct and proximate result of such breaches, Armadillo suffered significant losses and incurred substantial debts that they would not have otherwise incurred, all in amounts to be determined at trial.

98. Additionally, Sacco aided and abetted Evan's breaches of fiduciary duties to Armadillo, and in so doing Sacco breached his own fiduciary duties to Armadillo, making Sacco jointly and severally liable to Armadillo for any harm caused.

**WHEREFORE**, Armadillo demands the entry of judgment against Sacco for compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial, pre-judgment interest, post-judgment interest, costs, and such other relief as the Court deems just.

**COUNT IV**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**BY CONCORDIA AGAINST SACCO**

99. Concordia incorporates paragraphs 1 through 57 as if fully restated herein.

100. This is an action against Sacco for aiding and abetting breach of fiduciary duty owed to Concordia by Evan.

101. Evan breached his fiduciary duties to Concordia as set forth above.

102. Sacco had actual knowledge of Evan's breaches of fiduciary duty.

103. Sacco encouraged, actively participated in, and rendered substantial assistance to Evan's breaches of fiduciary duty.

104.    As a result, Sacco is jointly and severally liable for all damage actually and proximately caused to Concordia resulting from the acts and omissions of Evan.

**WHEREFORE**, Concordia demands the entry of judgment against Sacco for compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial, pre-judgment interest, post-judgment interest, costs, and such other relief as the Court deems just.

Dated this 9<u>th</u> day of June 2026.

> **VENABLE LLP**
> *Proposed Attorneys for Plaintiffs*
> 801 Brickell Avenue, Suite 1500
> Miami, Florida 33131
> Telephone: 305.349.2300
>
> By:  /s/ *Michael A. Friedman*
>    Glenn D. Moses, Esq.
>    Florida Bar No. 174556
>    gmoses@venable.com
>    Mariaelena Gayo-Guitian, Esq.
>    Florida Bar No. 813818
>    mguitian@venable.com
>    Michael A. Friedman, Esq.
>    Florida Bar No. 71828
>    mfriedman@venable.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been furnished via CM/ECF notification to all parties entitled to receive notice via CM/ECF on this 9th day of June 2026.

>  /s/ *Michael A. Friedman*
>    Michael A. Friedman, Esq.